McKEEVER et al. v. FONTENOT, Acting Collector of Internal Revenue.

PAN AMERICAN PETROLEUM CORPORATION v. SAME.

PAN AMERICAN PETROLEUM CORPORATION v. FONTENOT, Collector of Internal Revenue.

Nos. 834, 835, 1160.

District Court, E. D. Louisiana.
Sept. 19, 1938.

Lloyd J. Cobb (of Cobb & Jones), of New Orleans, La., and David Paine and George Koegler, both of New York City, for plaintiffs.

Courtnay C. Hamilton, Sp. Asst. to Atty. Gen., and Leon D. Hubert, Jr., Asst. U. S. Atty., of New Orleans, La., for defendants.

BORAH, District Judge.

Plaintiffs herein are the former and present owners and operators of an oil refinery which is located on the Mississippi river at Destrehan, Louisiana. They are in these actions seeking to recover the back

pipe line transportation taxes which were assessed and collected by the defendant pursuant to Section 731 of the Revenue Act of 1932, as amended, 26 U.S.C.A. § 1420 et seq. note, upon the ground that the movement of refined liquid products of petroleum from the refinery storage tanks through pump houses and pipe lines to vessels at the wharf at the refinery site does not constitute transportation of petroleum and its products by pipe line within the meaning of that section and Treasury Regulations 42, Art. 26. By written stipulation the parties agreed to waive a trial by jury and further agreed that these actions should be consolidated and tried and determined on the issue of law raised by the following agreed statement of facts and such further evidence not in conflict therewith as may be introduced by any party:

1. E. G. McKeever and A. E. Ralston, plaintiffs in the first above action, are duly appointed, qualified and acting liquidators of the Mexican Petroleum Corporation of Louisiana, Inc., a corporation duly organized under the laws of the State of Louisiana, and now in liquidation pursuant to a consent to dissolution executed conformably to the law of the State of Louisiana.

2. Pan American Petroleum Corporation, plaintiff in the second and third above actions is and at all times mentioned in said actions was a corporation organized and existing under the laws of the State of Delaware and is and at all times mentioned in said actions was duly authorized to transact business in the State of Louisiana.

3. Rufus W. Fontenot, defendant herein, was from June 19, 1934, until February 7, 1938, the Acting Collector of Internal Revenue of the United States for the District of Louisiana, and has been since February 7, 1938, the Collector of Internal Revenue of the United States for the District of Louisiana. He is a citizen and resident of the City of New Orleans, Louisiana.

4. From on or about February 9, 1918, until on or about August 31, 1934, the Mexican Petroleum Corporation of Louisiana, Inc., hereinafter called Mex Pet, owned and operated a petroleum refinery located on the Mississippi River at Destrehan, Louisiana.

5. On or about August 31, 1934, Pan American Petroleum Corporation, hereinafter called Pan Am, acquired said refinery from Mex Pet and thereafter at all times material it owned and operated said refinery.

The land upon which this refinery was situated was owned by Mex Pet and thereafter by Pan Am.

6. The taxpayer (which term means Mex Pet until August 31, 1934, and Pan Am thereafter) also owned and maintained various storage tanks situated on the aforesaid premises wherein it stored crude petroleum and the liquid products thereof as a part of the operation of said refinery.

7. The refinery site occupied a plot of land in an unbroken parcel located at Destrehan on the Mississippi River and the tax payer owned and maintained a wharf situated on its property on the banks of the Mississippi River at which vessels docked and discharged and were loaded with the liquid products of crude petroleum.

8. The aforesaid storage tanks were connected to one or all of four pump houses by various stationary pipelines owned by the tax payer. The pump houses were connected to the wharf by various stationary pipelines owned by the tax payer. The lines herein referred to vary in diameter from six to twelve inches.

Attached hereto marked Exhibit "A"[1] is a map of the refinery premises. The markings upon said map correspond to the markings hereinafter referred to.

(A) The following are the approximate distances via pipe lines:

I. Pump House "A" to the wharf 2200 feet.

II. Pump House "B" to the wharf 2600 feet.

III. Pump House "C" to the wharf 2700 feet.

IV. Pump House "C" to the loading rack "E" 550 feet.

V. Tanks 36, 37, 38, 39, 40 and 50 to the wharf 4200 feet.

VI. Tanks 202 through 221 to the wharf 5500 feet.

VII. Tanks 4 through 16 to the wharf 3600 feet. All tanks mentioned above are storage tanks.

(B) All crude oil brought into the plant comes through pipelines from the wharf into various storage tanks. No crude oil is shipped out from the refinery. All outward movements are of refined products. The pipe lines for the inward movement of

---

[1] Not for publication.

the crude and the pipe lines for the outward movement of refined products are laid side by side out to the wharf.

(C) Crude oil brought into the plant is first placed in a crude oil storage tank, from whence it is brought to the topping plant for the various cuts to be taken off. After this first operation, the products are transferred through the main pump house again to tanks containing untreated products. From such untreated tanks the products are moved to the treating plant and then into treated tanks. In some cases, or for certain products, they are brought back again to the asphalt tanks for making the cut-backs. Some of the products are shipped directly in tank cars from the loading racks and some off the wharf to barges and steamers. The inward movement of the crude petroleum from vessels at the wharf into the refinery was taxed originally, but the tax was refunded. The only movement taxed, other than as just stated, was that from the storage tanks through the pump houses to the vessels at the wharf.

(D) Petroleum, in course of refining, may pass several times through the pump houses. About 16% of all the petroleum and its products handled through the intramural lines is moved over the wharf to vessels.

(E) The pump houses used in connection with the tank car loading rack and the pump houses used in connection with the movement out to the wharf are identical, and the kind and type of pipe in the movement is also identical. Asphalt, gasoline, kerosene, or fuel oil are pumped from the particular storage tanks through the pump house into the tank car which may be anywhere from 100 feet to a mile from the particular storage tank. In the case of asphalt, the tanks are close to the loading rack, but in the other cases the tanks are the distance mentioned away.

(F) The refinery does not have any canning facilities for gasoline, kerosene or fuel oil and the delivery of refined products in bulk either to tank cars or vessels is the only method of delivery at the refinery.

(G) The products moved over the wharf to vessels are gasoline, asphalt, kerosene or other refined products. In the filling of orders, usually the Refinery Superintendent designates the particular storage tank from which the refined product is to be withdrawn and instructions are given by him to send the specified quantity out to the wharf.

9. The pipelines aforesaid are located wholly upon the tax payer's property. The Jefferson Highway, which is thirty feet wide, traverses the property. There is a levee on said property abutting the Mississippi River about ninety feet wide. The title under which the tax payer owns the said refinery site evidences ownership of the entire property to the Mississippi River, including the property on which the said highway and levee have been constructed. Under the Louisiana law the tax payer owns the fee to said road and levee, subject to a servitude in favor of the public. The pipelines running to the wharf cross the Jefferson Highway over elevated structures or are laid under said highway, onto the levee and thence to the wharf, but at all times are wholly within the premises owned by the tax payer.

10. All the pipelines aforesaid were privately owned by the tax payer at all times material herein and have always been used exclusively for the movement of the tax payer's own products, with the exception of loading certain gasoline sold by Mex Pet to and stored by it for Pan Am.

A copy of the contract between Mex Pet and Pan Am, under which this service was rendered, is hereto annexed and marked Exhibit "B",[1] plaintiffs in the above actions reserving the right to object to the materiality and relevancy of said contract.

During the period June 21, 1932, to June 30, 1937, both dates inclusive, the tax payer pumped liquid products of petroleum from certain of said storage tanks through said pipelines and pump houses in a continuous movement to and into vessels lying at said wharf. Power for the movement of said products, as aforesaid, was furnished by the tax payer.

11. The pipe used in said lines is of the same type and character as that usually and customarily used in the construction of pipelines by common carriers and public service companies engaged in the business of transporting crude petroleum and its liquid products for hire. Said pipe used in said lines is also of the same type and character as that usually and customarily used by an oil refinery engaged in the manufacture of liquid products of crude petroleum for lines performing functions similar to

---

[1] Not for publication.

those herein described. The lines herein described are used by the tax payer in the usual, customary and normal operation of its business which includes the storage and handling of the liquid products of petroleum and the delivery of all said commodities to carriers in connection with the marketing thereof.

12. Liquid products of crude petroleum at the time of the aforesaid movements from the storage tanks to vessels at the tax payer's wharf were sold by the tax payer to purchasers F. O. B. vessels at said wharf.

13. If the Court should find that any of the movements of the liquid products of petroleum hereinabove described upon which a tax was levied were not taxable within Section 731 of the Revenue Act of 1932, as amended, 26 U.S.C.A. § 1420 et seq., note, plaintiffs in each above action should be granted the applicable amount prayed for in their respective petitions plus taxable costs, otherwise their claims should be rejected in full.

Any party to this act may introduce any additional evidence, provided the same is not in contradiction of the matters herein agreed to.

The Court, in each action, makes the following findings:

The Court adopts as its findings of fact the facts hereinabove set forth and makes the following additional findings of fact.

1. The movements taxed were substantially similar to movements which pipeline carriers usually undertake and perform for hire.

2. The movements taxed were not incidental to the refining of oil but were movements which took place after all refining processes had been completed and were movements towards market.

### Conclusions of Law.

1. The movement of the refined products of petroleum from the refinery storage tanks to and over the loading wharf constitutes a taxable movement within the meaning of Section 731 of the Revenue Act of 1932, as amended.

2. The Commissioner of Internal Revenue properly disallowed plaintiffs' claims for refund.

3. It is immaterial to a decision of these suits that the pipelines were privately owned and were situated on plaintiffs' property; the ownership of the commodity transported is likewise immaterial.

4. The defendant is entitled to judgment as prayed for in each action and to have plaintiffs' suits dismissed at their costs.